Sidney Squire, J.
These six claims were tried together in Utica for four days and in Albany on a fifth day. At the opening of the trial, it was stipulated by counsel that the six claims be tried together; that one decision be rendered setting *443 forth the respective determinations of each claim and that separate judgments be entered thereon. Eventually, it was further agreed that every party hereto waives the submission of proposed decisions containing proposed findings of fact and proposed conclusions of law. The cases were finally submitted to this court on June 22, 1959.
The claims are predicated on the defendant’s alleged negligence in the .construction and maintenance of State highway Route No. 3, between Cranberry Lake and Star Lake, St. Lawrence County. The defendant had constructed said highway in 1926 and maintained it on July 9, 1954 and prior thereto.
On said date a little before 9:00 a.m., claimants Joseph W. White and his wife, Rena White, were riding in an automobile owned and operated by the husband, in a westerly direction from Star Lake toward Cranberry Lake. At the same time, claimants Delwin Moore Stevens and Luana P. Stevens (husband and wife), were in another motor vehicle with their five infant children, Shireen, Delwin Partridge, Marilyn Kay, Susan and Clayton. The automobile owned by Mr. and Mrs. Stevens was traveling in an easterly direction from Cranberry Lake towards Star Lake.
Said highway was a two-lane road. Each of said automobiles had been proceeding in their respective lanes. Earlier that morning it had rained intermittently. The rain had ceased but the road was wet.
As Professor Stevens was proceeding at about 40 miles per hour easterly, at a point approximately seven or eight miles east of the Village of Star Lake his automobile approached a curve. About 200 yards west of the beginning of said curve, there was a conventional diamond shaped “curve sign”. Stevens reduced the speed of his vehicle to about 35 miles per hour, going into the ascending curve to his right. As he came to the top of the curve he felt his car move to the left. He applied his brakes and attempted to steer the automobile into the right lane. Although he continued to turn the driving wheel to .the right, the vehicle nevertheless continued to move further into the left lane, colliding there with the front of the White automobile in its own lane, head-on. This occurred at about the fourth guide post from the east on the north side of the highway.
Rena White died instantly. Her husband was painfully injured and his automobile, a 1947 Chevrolet, damaged. Mr. Stevens was pinned behind the steering wheel, Mrs. Stevens was hurt and so were three of their youngsters, Marilyn Kay, four *444 years old, Susan, six years of age, and Delwin Partridge Stevens, seven. Their automobile, a 1953 Ford station wagon, owned by the Stevens couple, was wrecked. All of the injured were taken by ambulance to the Clifton-Fine Hospital at Star Lake.
We determine that the defendant is liable to each of the claimants for the resultant damages. None of the claimants was guilty of contributory negligence. In the White death claim, the defendant did not sustain its burden of proving any contributory negligence by the said decedent. None of the passengers had control of the respective vehicles. Nor was any action or inaction on their part responsible for what had happened. The fact that Mrs. Stevens, Susan and Delwin were asleep did not contribute in any way to the occurrence.
On the date at bar, Mr. Stevens was 45 years old, then attending a graduate school at Cornell University for his- Ph.D. degree^ The 1953 Ford station wagon had been purchased in August of that year, and later driven about 8,000 miles. Its brakes, steering equipment and tires were in good condition and the driver was familiar with its operation.
Eoute 3 was 22 feet wide on the straight road and 26 feet wide throughout the greater part of the curve involved. As Stevens was approaching from west to east, the only warning or notice which the State gave him was that he was approaching a curve. Stevens heeded the sign by reducing his speed.
Under the circumstances about to be delineated, the State owed a duty to these two families and others using said highway to provide a road which could be safely traversed by a stranger thereto, as well as to warn those approaching of a dangerous condition compelling speed to be reduced appropriately. There was no warning to Stevens of the type and conditions of the road and curve into which he was proceeding. The State did not notify him of a reduced speed which would be safe. He was given no notice sufficient under the existing circumstances of weather. The improper construction of the road, its inadequate maintenance and affirmative failure to post suitable warnings before entrance into the curve, were as to each, a proximate cause of what happened thereafter on said morning.
This road had been constructed by the State pursuant to section 125 of the Highway Law as then enacted. The plans therefor had been recommended by the State’s Division Engineer on July 15, 1926. There had been no change on any part of the road involved at the time of the occurrence. The photographic exhibits and sketches demonstrate the danger which existed.
Unfortunately, the road had not been. constructed according to the filed plans. It became and was a hazard for those traveling *445 eastbound on the curve. There were three coexistent factors which contributed to that result, i.e., the degree of curve, the grade of the road and the bank.
The physical facts were not controverted. Actually, from the beginning of the curve to the right, it had a degree of curvature varying between 9 degrees and 10 degrees until it reached the point of hazard where it suddenly increased to 12 degrees 30 minutes and became greater thereafter.
As for the grade, after a uniform .6% ascending (i.e., 6 foot per 100 feet of length), the ascending grade increased to 1.18%, then changed to .86%, but within 50 feet descended to a .68% grade and within the following 100 feet the descent rate more than doubly increased to 1.56% for 50 feet and up to 3.12% the following 50 feet. This is an increase of about 400% in 150 feet.
The bank in the curve began at 1% inches to 1% inches per foot, was reduced to 1 inch per foot, then to % inch per foot, % inch, % inch and finally level. The reductions of the bank instead of uniformity were. dangerous factors on the curve which Stevens was negotiating, constituting a hazardous condition under the circumstances.
The State’s construction plans for this curve of about 610 feet in length showed a uniform 10-degree rate of curvature, not the sudden * ‘ hooking ’ ’ which actually occurred. According to plans, the ascending grade was to be .6% uniform and should have been connected or tapered by a gradual 100-foot parabolic vertical curve into a gradual uniformly descending grade of 1.5%, not as the actual “curve” and “dip” existed that morning. So too, the plans required a uniform bank of 1% inches per foot of width, not for the actual varying and suddenly vanishing bank, flattening at the point of hazard. The plans had demanded such 100-foot .parabolic vertical curve. It was not constructed. Indeed, the- actual “ curve ” does not conform to a mathematical curve.
The construction of this portion of the road was not in accordance with good and accepted engineering practices and standards when built in 1926. On July 9,1954, and prior thereto, the road as maintained did not meet good and accepted engineering practices and standards.
A combination of these existing conditions above described caused a lessening of fractive resistance of the tires of vehicles on the pavement, created an irregular motion of automobiles, suddenly removed the stabilizing effect which a bank has on vehicles and caused appreciable lurching, swaying and/or skidding.
*446 As the hank flattened, the road dipped and the curve increased. Such alliance of physical factors constituted a dangerous condition of which the defendant knew or should have known, as the testimony demonstrated.
On July 9, 1954, James Henry Andre was a State Trooper stationed at the defendant’s substation in Star Lake. He had driven over this curve during the months of February, March, April and May. of that year in various kinds of weather at speeds from 35 to 40 miles per hour. He marked on claimants’ Exhibit 45 the place where his automobile traveling from west to east at about such speed during said months, would go into the left lane of traffic for about 75 feet, “in the wrong lane before being able to bring my car back into my own lane ’ ’.
He swore to his repeated observations of other automobiles proceeding in the same direction at about said speed. These cars at the spot on the curve “ also would go into the left lane of travel and then travel a short distance, probably fifty to seventy five or 100 feet— * * * approximately before getting back into their own lane of travel ”. In February of 1953, over a year before the occurrence, he reported this condition to his superior in charge of the substation, Trooper W. E. Burmester, who stated his own knowledge of the conditions.
On the day after the occurrence, Trooper Andre conducted a Ball Bank Indicator test at about 9:30 a.m. with Engineer Philip Boucher of the State Highway Department. They were in a 1953 Pontiac four-door sedan. The weather was clear. The pavement was dry. Obviously such conditions were much better and safer than the morning before when the road was wet after intermittent rain.
The testing automobile was driven over the curve a number of time at 50 miles per hour (the legal speed limit) in the direction Stevens had travelled. The indicator went behind the 20 mark proclaiming extreme unsafety. When the State automobile reached ‘ ‘ the dip ’ ’ and change in bank it crossed the center line of the highway and went into the left lane where it continued for about 75 feet. At 45 miles per hour, the indicator registered the same “ 20” and again the automobile was propelled into the left lane for about 75 feet. These tests were continued at various speeds until the indicator finally set at the safe mark of 10 at 35 miles per hour. But then the road was dry and the weather clear (conditions nonexistent on the morning in suit).
The State’s Safety Engineer, Mr. Boucher, was in the courtroom. He did not dispute or correct the foregoing factual proof or other testimony.
*447 The State should have placed signs on this road as one was approaching the curve from the west to give a driver sufficient notice and adequate warning that he was approaching a ‘‘ curve ’ ’ and “ dip ” where his speed should he reduced, stating a safe speed warranted under the circumstances. A lower safe speed should have been designated for wet pavement.
Stevens had no adequate warning of what he was going into on such a curve on an unfamiliar road, particularly with the pavement wét.
We hold that the State is liable for the maintenance of the road in a dangerous condition on the July day and that these physical facts had continued notoriously for such a length of time that the State should have had notice thereof, i.e., constructive notice. For over one year prior to the occurrence, the State’s Safety Engineer for the area had inspected this road at least bi-monthly. The defendant had ample time to warn users of the road.
Even if that were not so, without diminishing the force of the foregoing or adversely affecting the same, we further find that the State had actual notice of the dangerous situation. This is based at least on the oral report made by Trooper Andre to his superior in charge, Trooper Burmester, of what the former had personally experienced and. observed during the course of the performance of his duties as a Trooper in the Division of State Police, a component of the State’s Executive Department. The claimants are entitled to utilize the presumption of law that Burmester fulfilled his own duteous obligation of transmitting the facts to those above him with power to rectify the physical condition or de minimis, have adequate warnings erected.
Although Andre had left the State employ prior to the trial, Trooper Burmester was still working in such capacity but did not testify. The State did not call him as a witness. We believe the testimony of Trooper Andre. Incidentally, he had testified at the motor vehicle hearing after the occurrence and also on an examination before trial herein.
Despite the excellent cross-examination by the Assistant Attorney-General, a capable, experienced and effective trial lawyer, the proof adduced by Andre’s testimony and that of claimants’ highway experts, was not shaken. The claimants proved their respective causes of action.
The claim of Joseph W. White, individually, and as administrator of the estate of Rena White, deceased (Claim No. 32813), was filed on October 7, 1954 and a copy thereof served on the Attorney-General on the same day. As previously stated said decedent had died on July 9, 1954. Letters of administration *448 of her estate were issued to her said husband on October 5,1954 by the Court of Probate, County of Carroll, State of New Hampshire.
At the time of said demise the lady was 61 years of age with a life expectancy of 13 years. She was a housewife and also earned between $500 and $550 annually, operating a roadside fruitstand. She had been in good health and active. The reasonable value for which the defendant is liable for damages for her wrongful death including the reasonable funeral expenses of $871.80 are assessed at $10,871.80. Prom said amount there should be deducted the $4,500 which said administrator received in settlement of the action instituted in the United States District Court on behalf of said estate. The defendant is liable to said claimant Joseph W. White, as administrator, for the balance of $6,371.80 with interest thereon from July 9, 1954 to the date of entry of judgment herein.
Claimant Joseph W. White, individually, sustained painful personal injuries from this occurrence. He was in an oxygen tent for four days. He was sick and sore and was fed intravenously. He had fractures of the 3d, 4th, 5th, 6th, 7th and 9th ribs on the left side, fractures of the 6th and 7th ribs on the right side, numerous abrasions and lacerations of the right knee, a 1-inch laceration at the outer left forehead which required suturing and left a permanent scar, a %-inch laceration on the upper left eyelid which was sutured and left a permanent scar, had dizzy spells and headaches in the hospital and for months after the occurrence. A pre-existing left-inguinal hernia which had been the subject of two prior operations, was aggravated by the occurrence at bar.
He was at Clifton-Fine Hospital from July 9,1954 to July 22, 1954. Prom June 16, 1955 to June 25, 1955 he was a patient at the Higgins Hospital, Wolfboro, New York, where another hernia operation was performed on June 19,1955. His damages included the following reasonable items: $401.75 for hospitalization and $240 for medical attention. His recovery was good.
At the time of the occurrence White was 64 years old, a caretaker at Brewster Academy earning $65 per week. Because of his injuries he did not return to employment until three weeks and two days for part-time work.
This claimant’s resultant damages for which the defendant is liable to him are assessed at $11,250. Prom this there is deducted the $5,000 which Mr. White received from his settled cause of action in the United States District Court, making the balance $6,250. We have allowed no damages for Mr. White’s *449 automobile because as appears from Exhibit 21, his claim therefor was subrogated to his carrier.
The claim of Susan Stevens, an infant under the age of 14 years, by Delwin Moore Stevens, her guardian ad litem (No. 33778) was filed on May 1, 195.6 and a copy thereof served on the Attorney-General on the same day. Her father had been appointed such guardian ad litem by an order of this court, Major, J., dated December 15, 1955.
As a result of the occurrence herein she sustained abrasions about the face and neck with swelling and tenderness of the posterior chest and her left foot. From the highway she was taken to the Clifton-Fine Hospital, remaining thereat until July 13, 1954. None of said injuries was permanent. The defendant is liable to this claimant in the sum of $950 less the $300 received to settle her Supreme Court action, making the balance due herein $650.
The claim of Luana P. Stevens (Claim No. 33779) was filed on May 1,1956 pursuant to a permissive order (Court of Claims Act, § 10, subd. 5) signed by Young, J. The Attorney-General was served with a copy of this claim on May 1, 1956.
Mrs. Stevens had been severely injured as the result of the highway occurrence. She was taken by ambulance to the Clifton-Fine Hospital on said July 9, 1954 and was unconscious four days. The lady remained at the hospital until August 5, 1954 when she was transferred by ambulance to the Veterans’ Administration Hospital at Syracuse until August 19, 1954. Such hospitalizations were a continuous 42 days.
When she had arrived at the Clifton-Fine Hospital, her admission diagnosis was a skull fracture, inter-cranial hemorrhage plus bruises and lacerations. There was a swelling at the back of her head and she was bleeding from a scalp laceration in that area. Her temperature rose to 103.2 degrees. She developed a paralysis of the left upper lid and an arm paralysis. The lady was disoriented and irrational.
X rays showed a depressed fracture in the right temporal occipital of her skull. Her condition was such that after a conference of physicians it was decided that brain surgery was imperative. In that delicate operation, burr holes were made through her skull and a section of bone 2% inches by 3 inches was removed from the left parietal area by saw-cuts. Clotted subdural blood was discovered. The entire brain was under increased pressure and in a swollen condition.
Said removed bony section of the lady’s skull was discarded and the skin closed over the opening, leaving a hole in her head with a permanent disfiguration.
*450 Mrs. Stevens’ rehabilitation was slow, with improvement for a time but never attained normalcy. On that July day, she was 39 years old with a life expectancy of 30.08 years. A graduate of a Wyoming high school, a graduate nurse working in hospitals, she had done graduate work in surgery at the Mayo Clinic where she later worked in the operating room.
She had married Mr. Stevens in 1939 and they had five children. The lady was in excellent health and an attractive female, even tempered and well adjusted in her married life. She cared for the children and did all of the housework. The family life was a happy one.
This highway occurrence caused a permanent brain injury to the lady with a resulting lack of memory, slowness of speech, headaches and a general depression. She has a chronic brain syndrome with a post traumatic behavior and personality disorder. The brain damages also caused her to walk with a limp.
We carefully observed this lady who was before us. The State did not dispute any of the medical testimony, oral or written, although she had been examined a number of times by physicians selected by the State with access to the medical files.
Mrs. Stevens had lost her memory and was unable to express herself. She could not associate objects with words. Treatment was endeavored by an outstanding audiologist. She was unable to spell words at the 6th grade level or perform simple mathematical problems. She had to be retaught how to read and how to do elementary arithmetic as well as encouraged to speak.
On August 10, 1954 she was given the Eisenson Test for aphasia and related disturbances. It revealed that she had difficulty in understanding the differences between objects and pictures, recognized geometric forms but could not name them, could not write simple sentences or do multiplication or successfully read 8th grade material for full comprehension; was tired and confused. The prognosis then and at the trial was that there would probably not be too much further improvement.
The lady could not take care of her children and had to stay away from the family. About one year after the occurrence an unsuccessful effort was made to reunite her with her youngsters. The lady had to leave again. In the Spring of 1956, almost two years after the mishap, the family group was again re-established but she is unable to devote full time to her youngsters, her husband and her home. The lady is nervous, worries, tires, has a speech inhibition as well as inhibited thinking. She is tense, hesitant, inefficient and her memory is far from normal. These *451 conditions are permanent and are the direct result of the highway occurrence.
The claim demanded $101,135.50. Her damages are assayed at $72,380, less the sum of $400 received in settlement of her Supreme Court action, making the balance $71,980 due her.
The claim of Marilyn Kay Stevens, infant (Claim No. 33780), was filed in the office of the Court of Claims and served on the Attorney-General, both on May 1, 1956. Her father was appointed as her guardian ad litem by order; signed by Major., J., herein on December 24, 1955.
Marilyn was four years old. She was in the Clifton-Fine Hospital from the 9th of July, 1954 to the 14th of that month. She had a laceration in the skin of her left cheek about 1 inch long diagonally, abrasions on her upper left cheek, lower abdomen, and head. She was in pain and drowsy. On admission, a diagnosis included possible cerebral concussion but a subsequent X ray of the skull showed no fracture. By the time of the trial her only permanent injury was the healed 2.5 centimeter scar on the left cheek.
This little girl’s resultant damages are $1,800, less the $600, received in settlement of her Supreme Court action, making the balance $1,200 due her from the defendant.
The claim of Delwin Partridge Stevens, an infant under the age of 14 years, by Delwin Moore Stevens, his guardian ad litem (Claim No. 33781) was filed and a copy thereof served on the Attorney-General, both on May 1,1956. Such guardian ad litem had been appointed by order herein dated December 24, 1955.
This seven-year-old boy was in Clifton-Fine Hospital from July 9, 1954 until the 18th of that month. At the left temporal area of his skull he had a lacerated wound about 1% inches just inside the hair line with bleeding and extensive swelling of the adjacent scalp. His left shoulder was swollen and tender and there were numerous abrasions about the face and on his extremities.
During the afternoon of July 9, he was taken to the operating room where the scalp wound was further cleaned and dressed but not closed. X rays taken later in the afternoon did not show any bony damage. These negative, findings were not congruent with Dr. Persson’s clinical diagnosis. Additional X rays taken on the following day revealed a fracture of the left vault of the skull in the left temporal area without compression.
Two days thereafter he was returned to the operating room. Under anesthesia, the scalp wound was closed with two silk sutures.
*452 The boy improved and was permitted out of bed on the 15th and discharged from the hospital on July 18. Although he tired easily then, there were no definite abnormal neurological findings. This boy has suffered pain and has a permanent 3 centimeter healed, curved scar of the left temporal frontal region in the hair line.
This claimant’s resultant damage for which the defendant is liable to him is evaluated at $7,500 from which there is to be deducted $1,500 received from his settled cause of action in the Supreme Court, State of New York, Onondaga County, making the balance due him $6,000.
The claim of Delwin M. Stevens (No. 33875) was filed on June 5, 1956, pursuant to a permissive order (Young, J.) of May 25, 1956, and a copy of the claim was served on the Attorney-General on June 5,1956.
The collision had pinned Mr. Stevens behind the steering wheel with his chest pushed tightly against the wheel and his right leg twisted out of shape against the dashboard. While efforts were being made to get him out of the automobile, he was conscious for about one hour. The driver’s seat had to be broken in order to remove him from the vehicle. He was taken by ambulance to Clifton-Fine Hospital. He remained there until July 22,1954, when he was transported to the V. A. Hospital in Syracuse where he continued to be hospitalized until January 26,1955. Accordingly, he was at those two hospitals continuously for over six months.
On his admission to the first hospital, he complained of pain in the right thigh and left upper chest. There was tenderness, swelling and false motion in the said right upper thigh and both knees were lacerated. His left chest was swollen, discolored and tender and the lower portion of his neck was swollen. His pulse was rapid and weak. Morphine was administered to relieve the pain and intravenous fluids and blood transfusions begun to alleviate the shock. By 10 o’clock that evening he appeared to be out of shock.
X rays disclosed an extensive comminuted displaced fracture of the mid-portion of the right femur. On the following day, July 10, under local anesthesia, a hole was drilled through the lower portion of the femur and a wire inserted to which traction was attached. A Thomas splint and Pearson attachment were used. He was compelled to lie constantly on his back with his knees fixed. Further X ray taken on July 21 while in traction, revealed that the femur had been shattered into seven major fragments and numerous small fragments. G-ood healing was *453 further prevented by about one inch of over-riding. Throughout his stay in that first hospital he was in pain.
With his leg in traction, he was taken by automobile to the V. A. Hospital. There, surgery was resorted to for the second time to keep the ‘ ‘ fracture fixed ’ ’. A large metallic plate was inserted in his body as well as numerous metal screws. Two additional metal screws without contact with said plate were also used as additional fixation of the fracture segments. This patient was placed in a body cast extending from the toe of his right foot to his chest and down the left leg to the knee with his legs spread apart by a brace.
Thereafter, a third operation was performed. Bone taken from his right hip area was grafted along the shattered bone of his leg. Said bone graft was placed therein because there had been a deficiency of bony apposition on the upper portion of the fracture site following internal fixation and it was desired to bridge this gap and promote healing.
Mr. Stevens remained in casts from said July 22, 1954, to January 26, 1955. Until the preceding mid-December he had been confined to bed flat on his back. At that time, a modified cast was applied and he began to learn to walk with Canadian crutches. When he initially left the Veterans’ Hospital on January 26,1955, he tired easily, was weak and walked unsteadily with two crutches.
After periodical checkups, he returned to the V. A. Hospital on January 30, 1956. There, again in surgery, the metal plate was taken out. One of the metal screws and a portion of another metal screw were not removed. They will remain in his leg permanently. The claimant was discharged on February 10, 1956.
He walks with a limp which is permanent. The right thigh is considerably atrophied, there being one-inch atrophy compared with the left thigh. He has permanent scars on the right thigh and right iliac crest. Motion of his right knee is restricted to about 45%. Beneath the right kneecap there is a tenderness and crepitus. There is restricted motion of the torsal bone resulting from his prolonged immobilization.
The foregoing atrophy may be overcome with suitable muscular exercises. Mr. Stevens tires more readily than formerly. His leg is stiff and he cannot walk too great a distance. He has difficulty climbing stairs.
This claimant was 45 years of age on that July date, with a life expectancy of 27.62 years. As stated, he was a graduate student at Cornell University, working for his Ph.D. At the time of trial he was a professor of agricultural economics at *454 the University of Wyoming and a Bishop of the Mormon Church in Laramie in that State. He was unemployed during his periods of hospitalizations and thereafter. He is also entitled to compensation for his loss of consortium resulting from the mental impairment and physical inactivity of his wife, Luana P. Stevens.
This claimant should recover for the reasonable value of the hospital charges, medical services and ambulance costs for his wife, Luana, and their three children, Susan, Marilyn and Delwin P., as well as himself, and for household help required in the past and to be utilized in the future as a consequence of his spouse’s condition. The foregoing amount to $85 at the hospital and $50 for Dr. Persson, totalling $135 for Marilyn; $58 to the hospital and $50 for said Dr. Persson, totalling $108 for Susan; $144 at the hospital and $100 for the physician, total-ling $244 for his son; $510.50 for the Clifton-Fine Hospital, $1,494.75 for the Y. A. Hospital, $300 for Dr. Persson and $600 for Dr. Carter, aggregating $2,905.25 for Luana P. Stevens; and $262.25 for the first hospital, $3,887.05 for the Y. A. Hospital and $250 for Dr. Persson, totalling $4,399.30, and $30 for ambulance services for the claimant.
This claimant’s resultant damages for which the defendant is liable to him, are assayed at $78,501 less the $1 nominal consideration received by him in settlement of his action in the Supreme Court of the State of New York, County of Onondaga, making the balance due him $78,500.
As to each of the settlements in other courts referred to herein, there was a specific written reservation of every one of these claims against the defendant.
None of these claims has ever been submitted to any other tribunal for audit or consideration except as above set forth. None of these claims has been assigned except Mr. White’s cause of action for automobile damage, as related supra.
As for the motions on which decisions were reserved during and at the end of trial: those requesting testimony to be stricken are. denied; as are those for the dismissal of each claim herein. The implied motions of each claimant for judgment are granted.
The clerk of this court is directed to enter separate judgments against the defendant, the State of New York, as follows:
Claim No. 32813, in favor of claimant Joseph W. White, individually, for $6,250 and in favor of claimant Joseph W. White, as administrator of the estate of Rena White, deceased, for $6,371.80 with interest thereon from July 9, 1954;
*455 Claim No. 33778, in favor of Susan Stevens, an infant under the age of 14 years, by Delwin Moore Stevens, her guardian ad litem, for $650;
Claim No. 33779, in favor of Luana P. Stevens for $71,980;
Claim No. 33780, in favor of Marilyn Kay Stevens, an infant under the age of 14 years, by Delwin Moore Stevens, her guardian ad litem, for $1,200;
Claim No. 33781, in favor of Delwin Partridge Stevens, an infant under the age of 14 years, by Delwin Moore Stevens, his guardian ad litem, for $6,000; and
Claim No. 33875, in favor of Delwin Moore Stevens, for $78,500.
Enter separate judgments accordingly.