Fred A. Young, J.
On May 31, 1954, at about 10:45 p.m., claimant’s intestate, John F. Foley, was driving his 1951 sta- . tion wagon southerly on New York highway Route 303 in the Town of West Nyack. At a point 100 to 150 feet south of the intersection of Snake Hill Road and Route 303 the decedent’s automobile left the highway, proceeded down an embankment and came to rest about 35 feet from the westerly edge of the pavement. As a result of this accident John F. Foley was killed.
It was not controverted that the State of New York owned, constructed and maintained the highway over which decedent was traveling. The claimant contends that the State, through the incidents of ownership, was negligent in the manner of construction and maintenance of said highway and that this negligence was the sole and proximate cause of the accident and the resulting death.
In order to determine this issue of negligence, it is necessary to know the physical conditions as they existed in the proximate area of the accident. As a traveler proceeded southerly along Route 303, at a point some 3,350 feet north of Snake Hill Road, the highway was down-grade toward the south, varying in degree from 7.1% to 3.7% where the decedent’s auto left the roadway. Commencing just north of Snake Hill Road and continuing in a southerly direction the highway curved in an easterly direction, or to the left. The curve from the point of tangent to the point of curvature was 617 feet. At a distance north of the curve and on the westerly side of the highway, *1013 there were three warning signs. The first sign, which a southbound driver would see, was a large curve sign which indicated a curve to the left. Farther south was a second and smaller sign which indicated a' curve and intersection and still farther south and just prior to the curve was a large reflectorized sign indicating construction ahead.
Continuing south and entering the curve the Snake Hill Road intersected Route 303 from the west and approximately 30 feet south, again from the west, a New York Thruway interchange intersected the highway. Prior to the accident there had been a line of guardrails on the west shoulder of the highway commencing north and continuing around the entire curve, breaking only for the intersection with Snake Hill Road. The interchange had been under construction and an opening of between 40 to 75 feet was made and the guardrails for that distance were removed. A great amount of dirt fill had been used in the area to raise the level of the interchange to that of the highway. From the top of the hill through its full length there was a solid white line and throughout the curve there was a double solid line. The highway itself was constructed originally as a two-lane road 20 feet in width and had been widened 2 feet on both shoulders. The surface was a macadam pavement and on the night of the accident the weather was clear and the highway dry.
These were the uncontroverted characteristics of this curve as they existed. There were, however, several controverted physical conditions which must be discussed here so that a proper determination may be reached on the question of the State’s negligence, if any. Good engineering practices require that a curve conform as closely as possible to certain recognized standards. During the course of the trial it was shown by engineering experts that uniform banking or super-elevation around a curve is an important safety factor. It was further shown that variation in banking throughout a curve is not within the standards set for good engineering practices. Variation in banking around the curve over which the accident occurred was not disputed, only the amount of the variation as set forth by claimant’s expert was challenged by the State. In addition to this condition, it was established that the rate of curvature also varied throughout the curve. Although an expert for the State attempted to show a uniform degree of curvature, his testimony was based solely upon the State’s construction plans and his visual examination of the scene. He made no actual measurements throughout the whole curve to establish the actual curvature. Claimant’s expert, by a complete and accepted method. *1014 made actual measurements at the curve and found the degree of curvature to vary greatly throughout. The court must, therefore, assume that these measurements, not disputed by an accurate or complete method, were correct and established variations in the degree of curvature which were not acceptable as good engineering practice.
Assuming, arguendo, that these variations in both super-elevation and degree of curvature were not instrumental in the alleged wrongful death herein, there remains the fact that to safely travel this highway, the State was under a duty to warn the users of the highway that the negotiable speed around this curve was less than that which was safe upon the open highway where there were no restrictions. (White v. State of New York, 18 Misc 2d 441.)
On May 17, 1957, almost three years after the fatal accident herein, several ball-bank indicator tests were taken and the safe speed was determined to be 50 miles per hour. These tests were taken at the request of the Attorney-G-eneral’s office in prepartion for the instant trial. These tests were taken with a new car. It is not disputed that there have been extensive improvements over the years in the maneuverability of new automobiles and their ability to negotiate the curves upon the highways. This was conceded by the State engineers. It was also conceded that the new ear used during these tests did not represent the average car using the highway and the purpose of the test is to establish safety factors for the average car. Also it was conceded that the curve was not the same in 1957 as it was in 1953. Therefore, the tests made four years later were of no use to the court.
However, in 1953, a ball-bank indicator test was taken by the same employee of the State, a licensed engineer working for the Department of Public Works, and it was determined that the safe speed around this same curve was only 45 miles per hour. It was also admitted by this witness that a test taken with a new car was not representative of the average car. Certainly, the State has a duty to protect, not only those travelers using new, modern cars, but must protect, even to a greater extent, those who travel the highway in less safe vehicles — those used by the average American family.
The Uniform Traffic Control Manual of the State Traffic Commission is the authority of all State engineers. It is recognized as official by the State and by the courts. On page 3 of the manual we find the following language: “ Many accidents occur because the driver has been suddenly confronted by the unexpected. He therefore should be warned, insofar *1015 as is possible, if abnormal driving conditions exist ahead”. Then, again, on page 92 we find the following: “ Consideration of sight distance, intersections, accident record, etc., may dictate a speed lower than that determined by the ball-bank indicator. la such cases, the lower speed will be Considered the recommended speed ’ ’.
The ball-bank indicator test takeii in 1953, and mentioned supra,, indicated a safe speed of only 45 miles per hour. Yet no sign restricting the speed was placed on this curve. Certainly, accident reports must mean something to those in charge. While all accidents do not occur under similar circumstances, yet when so many accidents, and many of them fatal, take place in one aréa, a careful study of the situation is indicated. A careful investigation here would have clearly indicated, in the opinion of this court, a restricted speed zone area. Also a careful investigation would have discovered that variations existed in the curve. These variations were actual and were present.
After the accident and in rebuttal of claimant’s testimony, the State acknowledged the variations but differed with the claimant’s testimony oilly in degree of variation as above mentioned. Regardless of the degree of variation, to maintain a curve in such a condition was not good engineering practice. And, again as mentioned above, the many accidents which occurred here should have served some purpose in the nature of warnings of the dangerous conditions that existed. The State did not take the proper precaution that the situation warranted. It would seem to us that consideration should have been given the whole area, especially because of the traffic experience encountered here, and, in addition, to the several complaints which had been received by the Department of Public Works.
In defense, the State attempted to establish that the claimant’s decedent was traveling at an excessive rate of speed. There was no evidence to this effect. Furthermore, the State produced two witnesses to show that effective warning devices had been present prior to the accident to warn oncomers that a dangerous condition existed. The overwhelming testimony of other witnesses disputes this and the court cannot find that sufficient warning signs were in place. In view of the physical characteristics of this curve, because of the construction in progress in the immediate area, the daily changing condition in the area due to this construction and the lack of sufficient warning devices restricting the speed necessary to safely negotiate this curve, the court finds that this curve was in a dangerous condition of which the State had a duty to inform the public.
*1016 As to the question of notice, in December, 1950, a letter was written to the Department of Public Works, apprising it of the condition which existed at the scene on Route 303 around the curve in question. The receipt of this letter was acknowledged and signs were thereafter erected. However, these signs did not restrict speed. (Emphasis by the court.) Following this letter, and prior to the death of claimant’s decedent, many serious accidents, several of them fatal, occurred upon this particular curve under similar circumstances and reports of these were filed with the Department of Public Works. There can, therefore, be no-question but that the State had actual notice of the dangerous condition which existed at this location.
The court fails to find any negligence on the part of the deceased, John F. Foley, which contributed to the accident, and in view of the preponderance of the evidence concerning the physical characteristics of this curve, the court must find the State of New York was negligent in its ownership, construction, control and maintenance of Route 303 at the area at and near the point where claimant’s decedent lost his life. The court further finds that this negligence was the sole and proximate cause of the death of decedent.
An award is made in an accompanying decision.